**In re Harold P. WALTERS and Patricia A. Walters, Debtors.**

**UNITED STATES NATIONAL BANK IN JOHNSTOWN, Plaintiff,**

v.

**Harold P. WALTERS and Patricia A. Walters, Defendants.**

Bankruptcy No. 81–1870.
Adv. No. 82–363.

United States Bankruptcy Court, W.D. Pennsylvania.

Sept. 30, 1982.

---

Thomas P. Zwilling, Pittsburgh, Pa., for plaintiff.

Sanford M. Lampl, Pittsburgh, Pa., for defendants.

## MEMORANDUM OPINION

JOSEPH L. COSETTI, Bankruptcy Judge.

This case comes before the Court on a Complaint objecting to the discharge of the Debtors and objecting to the dischargeability of a particular debt. The Complaint was filed by the United States National Bank in Johnstown (the "Bank"). The Bank in its Complaint and by subsequent motion at trial has alleged one count for objecting to the dischargeability of its debt pursuant to Section 523(a)(2) of the Bankruptcy Code and three counts for objecting to discharge pursuant to Section 727(a)(7).

## FACTS

Harold Walters was an officer of Summit Mines, Inc. (the "Corporation") and a partner in Summit Mines Co. (the "Partnership"). (These will be referred to collectively as "Summit".) These two entities filed for relief under Chapter 11 on April 30, 1980 under Nos. 80–634 and 80–633, respectively. These two cases were subsequently converted to cases under Chapter 7 of the Bankruptcy Code on February 27, 1981 and a Trustee was appointed to liquidate those estates. The Bank has initiated an action against the Trustee and others to recover payments allegedly made to other unsecured creditors in which the Bank claims it was secured. The Bank also has joined with the Trustee to recover money from a creditor who allegedly received a preferential transfer from the partnership.

This partnership was the owner of certain coal leases and equipment. The corporation, which was wholly owned by Harold Walters and his partner, leased the equipment and mined the coal on the property owned by the partnership.

In April of 1979 the partnership negotiated a line of credit for $200,000.00 with the Bank. This line of credit was collateralized by giving the Bank a security interest in the accounts receivable generated from the coal sales. In April of 1979, the first 30-day note was executed by the partners for the partnership in favor of the Bank. The Bank would loan money against 70% of these accounts receivable up to a maximum of $200,000.00. At the end of each 30-day period, the prior note would be paid off and new money would be loaned and a new note executed against new receivables. In July of 1979, the partnership requested an increase in the line of credit to $400,000.00. The partnership explained to the Bank that it needed the loan for additional working capital. In fact, the principal reason was that a principal customer of the partnership, Fetterolf Mining Sales Company ("FMSC") was not paying the receivables on time.

The testimony did not establish the exact percentage of the coal sales made by the partnership to FMSC, but FMSC appears to have been a major account. FMSC had been organized in 1978. FMSC's facilities consisted of a railroad siding and a coal cleaning plant located in Freidans, Pennsylvania within a half of a mile of Summit's operations. FMSC was a corporation whose stock was owned 80% by the Fetterolf Group, Inc. and 20% by the partnership.

In August of 1979, the partnership took over the stock owned by the Fetterolf Group, Inc. The reasons for this are not clear. One reason was dissatisfaction over

the price FMSC was placing on their partnership coal. Also, it appears that FMSC was not making payments to the banks which had financed the purchase of the FMSC coal cleaning plant (the "banks"). The partnership apparently felt it could make these payments more promptly and prevent these banks from foreclosing. The partnership agreed to repay the Fetterolf Group, Inc. roughly $640,000.00 which was its initial capital outlay in starting FMSC, in return for transferring its 80% ownership of FMSC to the partnership. At the time of transfer of FMSC stock to the partnership, FMSC owed the partnership approximately $700,000.00.

After this "takeover" of FMSC in August of 1979, the books of all three entities continued to be maintained separately. This continued even after October of 1979 when FMSC books were transferred to the offices of the partnership. A system of intercompany billings was used. The partnership would bill the corporation for the use of the equipment, etc., and more importantly, when a load of coal was transferred from the partnership to the cleaning plant, a sale to FMSC was recorded on the partnership's books. When a payment check came into the offices from a third party to pay the partnership for coal that was purchased, the check on most occasions was endorsed over to FMSC.

The practice described above continued until March 7, 1980 when the Fetterolf Group, Inc. took back control of FMSC. FMSC, under control of the partnership, had made a $350,000.00 payment to the banks on October 1, 1979; however, no payment was made in the early part of 1980 as required. In addition, the banks insisted that Fetterolf Group, Inc. again take control of FMSC or they would declare the loan in a default. As a result, on March, 1980 control of FMSC was returned to the Fetterolf Group, Inc. This was recorded on the partnership books as a $340,000.00 investment by the partnership in FMSC stock and the cancellation by the partnership of a $900,000.00 receivable due from FMSC. In addition, Mr. Walters was relieved of personal liability on a note due to the banks

when the Fetterolf Group, Inc. took over FMSC again. This transaction was not disclosed on the bankruptcy petition of the partnership, which was signed by Mr. Walters.

The partnership bankruptcy petition also failed to list accounts receivable of approximately $350,000.00 in which the Bank was secured and was due as of the date of filing. The partnership petition did not disclose that the account receivable resulted from the sale of a coal inventory of approximately 10,000 tons of coal within the 24 hours preceding the filing, even though the last of this coal was moved on the morning of the day the bankruptcy was filed. The coal was sold to a third party who paid an average of $24.00 a ton for the coal. There was testimony that some of the coal was worth $35.00 a ton. The partnership had previously received a $100,000.00 advance payment on the coal from another company, which was not the ultimate buyer of the coal.

DISCUSSION

The Court finds that the evidence introduced by the Bank failed to implicate Patricia Walters in any of the schemes outlined above. The Court accordingly grants the Motion to Dismiss the action as to her.

With regard to the actions against Mr. Walters, the Court notes that the Section 727 complaints against Mr. Walters consist of his failing to list the receivables, failure to disclose the FMSC transaction, and failure to disclose the sale of the coal pile. Although these alleged activities occurred in the partnership case, they could be grounds for objection to discharge in Mr. Walter's individual case by virtue of Section 727(a)(6). Thus, these allegations, if proven, would be grounds for denying the discharge of Harold Walters.

The Bank, however, has offered to withdraw the Section 727 objections to discharge if this Court finds the debt owed to it nondischargeable by virtue of Section 523(a)(2).

Therefore, we turn first to the Section 523(a)(2) count. The Court finds that the

debt owed to the Bank is nondischargeable and accordingly does not answer in this opinion whether the Bank has also proved its case under Sections 727((a)(2), (4) and (6).

Section 523(a)(2)(A) provides:

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—

(A) false pretenses, a false representation, or actual fraud

The Bank urges the Court to find that the partnership, and thus the individual partner Harold Walters, borrowed money from the Bank based on invoices that Walters knew to be false and misleading. The Bank argues that from April of 1979 the receivables to FMSC were not, in fact, receivables in a real sense. That is, FMSC was partly owned by the partnership and Walters knew FMSC was not paying its bills. Secondly, the Bank argues that it was told that the reason for the increase in the line of credit was the need for additional working capital, when, in fact, the primary reason was that FMSC was not paying its bills. Thirdly, the Bank states that it was not informed when FMSC was taken over by Walters' partnership and that the invoices that were taken to the Bank subsequent to the takeover showing coal sales to FMSC were totally false, since at that time FMSC was totally owned by the partnership.

Walters defends first arguing that the FMSC invoices did not constitute a large number of the invoices submitted to the Bank. The main defense of Walters is that there was no fraudulent intent to mislead the Bank. He testified that he felt that FMSC invoices were, in fact, a receivable owed to the partnership. He also testified that he is not that sophisticated in financial transactions and that the invoices taken to the Bank were selected by his accountants. In summary, because there was no intent to fraud, he believes the debt should be discharged.

It is true under the Bankruptcy Code that in order to object to discharge on the grounds of fraud, the fraud must be shown to have been intentional and not constructive. See 3 *Collier on Bankruptcy,* ¶ 523–08(4), (15th Edition 1982). Admittedly, this intent necessary is in the mind of the Debtor and difficult to prove. The Court may base its findings, however, on inferences from acts of the Debtor that intent was present. The Plaintiff must prove all the elements asserted in his objection to dischargeability. *In re Pioch,* 235 F.2d 903, 905 (3rd Cir.1956). This must be done by a preponderance of the evidence, *Fierman v. Lazarus,* 361 F.Supp. 477 (D.C. Pa.1973) aff'd without op. 493 F.2d 1400 (3rd Cir.1974). The burden to go forward shifts to the Debtor and he then has to rebut the prima facie case presented by the Plaintiff. *In re Houtmann,* 568 F.2d 651, 655 (9th Cir.1978).

When this matter is viewed as a whole, the Debtor appears to have engaged in a conscious scheme to defraud the Bank. The Debtor argues that the invoices were selected and taken to the Bank by his accountants, implying that they are culpable if any persons are. He makes the same argument that the accountants are responsible for the failure to list accounts receivable in the bankruptcy petition. Under these circumstances, the Court does not believe such explanation. The ultimate responsibility was the Debtor's. He signed some of the invoices and according to the accountants' testimony approved those invoices which were selected. In addition, he negotiated the line of credit from the Bank. He participated in the turnback of FMSC stock to the Fetterolf Group, Inc.

The evidence presented by the Plaintiff was not rebutted by the Debtor in a credible manner. For the reasons set forth, the debt owed by Harold Walters to the Bank is held to be nondischargeable.

An appropriate Order will issue.